FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

DEC 0 1 2025

TAMMY H. DOWNS, CLERK
By:_____
                        DEP CLERK

**DANIEL KING**

    **PLAINTIFF**

**VS.**

**BAD BOY MOWERS, LLC**

    **DEFENDANT**

Case No. 4:25-cv-*1247-BSM*
**JURY DEMANDED**

## COMPLAINT

COMES NOW Plaintiff Daniel King (hereinafter "Plaintiff" or "Mr. King"), by and through his counsel, Grayson Hinojosa, and files this Complaint against Defendant Bad Boy Mowers, LLC (hereinafter "Defendant" or "the Company"), and in support states as follows:

### NATURE OF ACTION

1. Plaintiff brings this action against Defendant to recover damages for unlawful discrimination and retaliation in violations of his rights under the Americans with Disabilities Act, as amended ("ADA") (42 U.S.C. § 12101, et seq.), Title VII of the Civil Rights Act of 1964, as amended ("Title VII") (42 U.S.C. § 2000e et seq.) and the Arkansas Civil Rights Act of 1993 ("ACRA") (Ark. Code Ann. §16-123-101, et seq.).

### PARTIES

2. Plaintiff repeats and re-alleges all the preceding paragraphs as if fully set forth in this section.

3. Plaintiff is an adult resident of Russellville, Pope County, Arkansas and was employed by Defendant at all relevant times.

This case assigned to District Judge *Miller*
1 and to Magistrate Judge *Moore*

4. Defendant is a foreign limited liability company organized under the laws of Delaware and registered to conduct business in the state of Arkansas with a principal place of business in Batesville, Arkansas. Its registered agent of service is CT Corporation System 320 S. Izard Street, Little Rock, Arkansas 72201.

5. At all relevant times herein, Defendant was an employer within the meaning of 42 U.S.C. § 2000e (b), (g), and (h).

## JURISDICTION AND VENUE

6. Plaintiff repeats and re-alleges all the preceding paragraphs as if fully set forth in this section.

7. The Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and Ark. Code Ann. § 16-123-107(c)(1)(A).

8. This Court is the proper venue for this case pursuant to 42 U.S.C. § 2000e-5 and 28 U.S.C. § 1391, as the unlawful employment practices alleged in this Complaint occurred within the Eastern District of Arkansas, and a substantial part of the events giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

9. Plaintiff repeats and re-alleges all the preceding paragraphs as if fully set forth in this section.

10. Defendant manufactures lawn mowers out of its Batesville, Arkansas facility.

11. Plaintiff was employed by Defendant as a welder at Defendant's Batesville facility from January 23, 2023, until November 11, 2024.

12. Plaintiff has a disability within the meaning of the 42 U.S.C. § 12102(1)(A), in that he has a mental impairment, specifically a Specific Learning Disability, which substantially

2

limits one or more major life activities, including but not limited to, learning, reading, writing, and concentrating. Plaintiff was diagnosed with this condition and received special education services during elementary school, creating a record of impairment. To aid in his educational development, Plaintiff was given one-on-one instruction on a weekly basis and given extended time to complete homework and tests, among other considerations.

13. Despite Plaintiff continuing to suffer from his Specific Learning Disability at all relevant times during his employment by Defendant, Plaintiff was fully qualified and able to perform the essential functions of his job at all relevant times with or without a reasonable accommodation.

14. Beginning in early 2024, Plaintiff was subjected to frequent harassment by his coworkers.

15. Several of Plaintiff's coworkers would call him "retard," and other variations of the word "retard," and referred to him by the nickname "Double D," which Plaintiff learned was short for "Dumb Dumb." Coworkers also referred to the area in which Plaintiff worked as the "retard room." Plaintiff was often mocked for the length of time it took him to complete tasks and was also mocked regarding the quality of his work.

16. Several of Plaintiff's coworkers would also call him "gay" and other variations of the word "gay," intended as insults.

17. Coworkers told Plaintiff that numerous employees thought that he was a homosexual, to which Plaintiff replied that he was not.

18. On numerous occasions, Plaintiff's coworkers would tamper with or hide tools he regularly used and needed to perform his job.

19. The harassment Plaintiff endured occurred on a weekly basis, often multiple times per week.

20. When the harassment first started, Plaintiff tried to laugh it off or ignore it.

21. On one occasion, a coworker named Aaron Watson ("Watson") approached Plaintiff from behind, pretended to hug him, and then simulated sexual intercourse by "humping" Plaintiff. Multiple coworkers witnessed the incident.

22. On or about March 2, 2024, fearful that the harassment would continue to escalate, Plaintiff reported the harassment to one of his leads, Bobby Armstrong ("Armstrong"), as well as to his supervisor, Shane Blevins ("Blevins").

23. Sometime during the morning of March 4, 2024, Plaintiff met with Blevins to discuss the harassment further. During this discussion, Plaintiff told Blevins that the harassment had to stop. Blevins told Plaintiff that he would put a stop to it.

24. On March 4, 2025, shortly after Plaintiff's discussion with Blevins, the two of them met with a person named Dustin who worked in the human resources department ("HR"). During the meeting, Plaintiff informed Dustin and Blevins of his coworkers constantly calling him names such as "gay" and "retarded," tampering with his work tools, referring to his work area as the "DD room" or the "retard room," and the incident in which Watson mockingly "humped" Plaintiff in front of others. Plaintiff told Dustin and Blevins that a coworker informed him that "DD room" stood for "Dumb Dumb room." Blevins suggested to Plaintiff that he avoid the coworkers who were harassing him.

25. In order to avoid the harassing coworkers, Plaintiff was advised to not even enter certain coworkers' workspaces. This was problematic for Plaintiff because avoiding certain people and certain workspaces meant that he would have to walk longer and more

4

inconvenient routes to access the restrooms, breakrooms and other various area that Plaintiff would typically frequent. Plaintiff told Blevins that it felt like he was being punished instead of the coworkers who were actually harassing him.

26. On March 4, 2025, shortly after Plaintiff's meeting with Dustin and Blevins, Plaintiff had another meeting with Dustin, a person named Jason from HR, and Mary Duvall, who was also from HR, as well as other individuals with whom Plaintiff was not familiar. Plaintiff informed all in attendance of the persistent harassment he had been enduring for months. At the end of the meeting, Plaintiff was informed that HR would investigate the allegations.

27. In April 2024, as a result of HR's investigation, employees were required to attend a brief lecture regarding Defendant's sexual harassment policies and sign a sexual harassment notice. An individual from HR conducted the lecture, which lasted about five or ten minutes.

28. Shortly after HR's intervention, Plaintiff was informed by multiple coworkers that other employees did not trust him anymore because he complained to HR. Coworkers told Plaintiff that the harassment would not stop until he resigned.

29. After HR's involvement, Plaintiff's coworkers continued to harass him by tampering with his tools when he was not around. Examples of how they would tamper with Plaintiff's tools included welding Plaintiffs tools to his jig, turning off the gas to Plaintiff's equipment, and inscribing insulting messages, like "DD"' and "gay little bitch," on his tools or work area.

30. Coworkers also retaliated against Plaintiff by giving him the silent treatment and isolating him in the workplace. During this period, Troy Davis ("Davis"), one of the few

employees who continued speaking with Plaintiff and a friend of Plaintiff's, began relaying messages from the harassing coworkers. On multiple occasions, Davis relayed taunting messages from the harassing coworkers, which were aimed at insulting his work performance and intelligence. Davis further warned Plaintiff that the coworkers planned to continue retaliating and taunting him until he resigned.

31. In June 2024, Plaintiff was involved in an altercation with a coworker named Jared, who swung his fists at Plaintiff, called Plaintiff a "fag," and threatened to kill Plaintiff. Multiple employees witnessed the incident.

32. Plaintiff reported the incident to Blevins on the same day that it occurred. Blevins told Plaintiff to stay away from Jared and that he would tell Jared to stay away from Plaintiff as well. Blevins asked Plaintiff if he wanted to inform HR. Plaintiff replied that he did want to inform HR. Multiple times, Blevins asked Plaintiff if he was certain that he wanted HR involved, and each time Plaintiff responded that he did.

33. Plaintiff then reported the incident to Officer Larry Ring ("Officer Ring") of the Batesville Police Department due to believing that Blevins was not going to address the incident. Plaintiff told Officer Ring that he did not want to file an incident report and that he just wanted him to address it with Defendant.

34. Officer Ring reported Plaintiff's disclosure to Defendant's head of security, Alan Cockrill ("Cockrill"), and to an additional Human Resources representative.

35. After Plaintiff went to the police, Plaintiff had a meeting with Duvall and Cockrill regarding his incident with Jared. During the meeting, Duvall and Cockrill told Plaintiff that they did not like that Plaintiff contacted law enforcement about the incident with Jared.

6

36. In August 2024, Davis began ignoring and avoiding Plaintiff, mirroring the behavior of the other coworkers. When Plaintiff asked Davis why he was acting that way, Davis explained that he feared the coworkers would start treating him the same way if they saw him associating with Plaintiff. Davis further warned that the coworkers would escalate their retaliation if Plaintiff continued reporting their conduct to HR or management. Plaintiff notified Blevins about Davis's change in behavior and asked Blevins to help serve as a "peacemaker." Blevins agreed to try but also advised Plaintiff to keep his distance from Davis.

37. In October 2024, while at work, Plaintiff asked Davis why he was ignoring him. Davis responded by yelling at Plaintiff, calling him "faggot," and threatening to fight him.

38. Defendant's response to the incident was to transfer Plaintiff to another department where he would be required to use a forklift. Plaintiff told Blevins that he was nervous about using a forklift because he was not certified to use one. Blevins told Plaintiff that they would get him certified.

39. Around the time of his transfer, Plaintiff concluded that Defendant had no intentions of properly addressing the harassment he had endured for months and feared that the situation would ultimately result in his termination rather than discipline for the coworkers responsible. As a result, Plaintiff inquired about employment with another company.

40. A person who some employees referred to as "Safety Sam" conducted Plaintiff's forklift training. During the training, Safety Sam told Plaintiff to be careful operating the forklift because people often walked around without paying attention to their surroundings and

that other forklift operators would drive around the facility too fast. Safety Sam cautioned Plaintiff not to speed around the facility like other drivers would sometimes do.

41. On November 6, 2024, while Plaintiff was operating a forklift, one of the team leads reported to Blevins that Plaintiff was acting strangely.

42. Blevins approached Plaintiff and asked Plaintiff if anything was wrong. Plaintiff told Blevins that his eyes were irritated and that it may be because of his contacts. Plaintiff explained to Supervisor Blevins that his contact lenses had been bothering him.

43. Supervisor Blevins instructed Plaintiff to clock out and see a doctor about his eye issues.

44. Plaintiff visited a doctor as instructed that same morning.

45. Sometime that same morning, Plaintiff received a call from Hopping who informed him that he was suspended until further notice. Hopping told Plaintiff that he was suspended for suspicion of being under the influence at work. Plaintiff told Hopping that he was not under the influence at work and that the only problems he had earlier at work were due to his eyes being irritated. Plaintiff told Hopping that he would bring a doctor's note to prove as much. Later that day, Plaintiff hand-delivered his doctor's note to Safety Sam.

46. Fearing that Defendant was looking for an excuse to terminate him, Plaintiff contacted the company with whom he previously inquired about a job opening. The person Plaintiff spoke to instructed him to take a pre-employment drug test, which Plaintiff did as instructed. The drug test was administered within a couple days of being sent home from Defendant.

47. After receiving Plaintiff's doctor's note, Hopping called Plaintiff and instructed him to return to work on Monday, November 11, 2024.

48. On Monday, November 11, 2024, Plaintiff showed up to work as instructed. Plaintiff worked for two to three hours, at which point someone from either management or HR told Plaintiff he had to take a drug test, which Plaintiff did as instructed.

49. After the test, Defendant informed Plaintiff that he had failed the drug test and was terminated effective immediately.

50. Defendant never showed Plaintiff the results of the drug test.

51. On or about November 12, 2024, Plaintiff was informed by a representative of his prospective employer that he passed the drug test.

52. Defendant's drug use policy does not forbid medical marijuana usage outright. The policy only prohibits employees from being under the influence of marijuana at work or possessing marijuana at work.

53. Defendant was not under the influence of marijuana on November 6, 2024, nor was he in possession of it on November 6, 2024. The drug test administered by Defendant on November 11, 2024, could not have shown whether Plaintiff was under the influence five days prior.

**COUNT I: Title VII- Sexual Harassment/Hostile Work Environment in Violation of 42 U.S.C. § 2000e-2**

54. Plaintiff repeats and re-alleges all the preceding paragraphs as if fully set forth in this section.

55. Plaintiff is a male and member of a protected class under Title VII.

56. Plaintiff was subjected to unwelcome sexual harassment.

57. Plaintiff's coworkers approached him from behind, pretended to hug him, and then simulated sexual intercourse by "humping" him from behind.

58. Plaintiff's coworkers called him "gay" and made sexually suggestive comments.

59. The harassment Plaintiff experienced was based on sex.

60. The sexual nature of the physical conduct and verbal comments directed at Plaintiff constituted harassment based on sex.

61. The harassment affected a term, condition, or privilege of Plaintiff's employment.

62. The harassment was sufficiently severe and pervasive to create a hostile work environment that altered the conditions of Plaintiff's employment.

63. The harassment started in early 2024 and continued until November 2024.

64. Defendant knew or should have known of the harassment and failed to take appropriate remedial action.

65. Plaintiff reported the sexual harassment to his supervisor and HR in March 2024.

66. Despite HR having employees sign a sexual harassment notice and attend a brief lecture regarding sexual harassment, the harassment continued, and Defendant failed to take effective measures to stop it.

67. Plaintiff continued to report the harassment all the way through to his termination in November 2024.

68. The harassment culminated in Plaintiff's termination in November 2024.

**COUNT II: Title VII- Sexual Harassment/Retaliation in Violation of 42 U.S.C. § 2000e-3**

69. Plaintiff repeats and re-alleges all the preceding paragraphs as if fully set forth in this section.

70. Plaintiff engaged in protected activities.

71. Plaintiff opposed the sexual harassment and informed management and HR of the unwanted harassment as early as March 2024, and on multiple occasions reported the continuing harassment to management through November 2024.

72. The harassment Plaintiff reported included being called "gay," and other variations of the word "gay" intended as insults, and being "humped" by a coworker.

73. Plaintiff suffered an adverse employment action.

74. Plaintiff was terminated from his employment on November 11, 2024.

75. There was a causal connection between Plaintiff's protected activity and the adverse employment action.

76. Plaintiff was terminated after repeatedly reporting harassment related to his perceived disability.

77. The timing and circumstances of Plaintiff's termination suggest a causal connection to his complaints.

78. Plaintiff was accused of acting strangely on a forklift on November 8, 2024, sent home, and then required to take a drug test on November 11, 2024, which Defendant claimed he failed.

79. Plaintiff passed a drug test for a new job the very next day, suggesting Defendant's stated reason for termination was pretextual and may have been in retaliation for Plaintiff's complaints about sexual harassment.

## COUNT III: ADA — Discrimination in Violation of 42 U.S.C. § 12112

80. Plaintiff repeats and re-alleges all the preceding paragraphs as if fully set forth in this section.

81. Plaintiff was regarded as having a disability within the meaning of the ADA.

82. Plaintiff has a history of Specific Learning Disability that required special school programs.

83. Plaintiff's coworkers called him derogatory names like "Double D" (Dumb Dumb) and "retarded," demonstrating that they regarded him as having a mental impairment.

84. Plaintiff's coworkers referred to his work area as the "DD room" and the "retard room," further demonstrating that Plaintiff was regarded as having a mental impairment.

85. Plaintiff was qualified to perform the essential functions of his job.

86. Plaintiff was hired as a welder and performed his job duties from January 23, 2023, until his termination on November 11, 2024.

87. Plaintiff was later trained to operate a forklift, demonstrating that defendant considered him qualified to perform additional job duties.

88. Plaintiff suffered an adverse employment action.

89. Plaintiff was terminated from his employment on November 11, 2024.

90. The circumstances give rise to an inference of discrimination based on Plaintiff's perceived disability.

91. Defendant claimed that Plaintiff failed a drug test, but Plaintiff passed a drug test for another job the very next day, suggesting that defendant's stated reason for termination was pretextual.

92. The timing of Plaintiff's termination, following months of disability-based harassment, supports an inference that Plaintiff's termination was based on his perceived disability.

## COUNT IV: ADA- Retaliation in Violation of 42 U.S.C. § 12203

93. Plaintiff repeats and re-alleges all the preceding paragraphs as if fully set forth in this section.

94. Plaintiff engaged in protected activity under the ADA.

95. Plaintiff reported harassment related to his perceived disability to his supervisor and to HR.

96. The harassment Plaintiff reported included being called "retarded" and having his work area referred to as the "Retard Room."

97. Plaintiff suffered an adverse employment action.

98. Plaintiff was terminated from his employment on November 11, 2024.

99. There was a causal connection between Plaintiff's protected activity and the adverse employment action.

100.    Plaintiff was terminated after repeatedly reporting harassment related to his perceived disability.

101.    The timing and circumstances of Plaintiff's termination suggest a causal connection to his complaints.

13

102.     Plaintiff was accused of acting strangely on a forklift on November 8, 2024, sent

home, and then required to take a drug test on November 11, 2024, which Defendant

claimed he failed.

103.     Plaintiff passed a drug test for a new job the very next day, suggesting

Defendant's stated reason for termination was pretextual and may have been in retaliation

for Plaintiff's complaints about disability-based harassment.

**COUNT V: ADA- Hostile Work Environment in Violation of 42 U.S.C. § 12112**

104.     Plaintiff repeats and re-alleges all the preceding paragraphs as if fully set forth in

this section.

105.     Plaintiff is a qualified individual who was regarded as having a disability within

the meaning of the ADA.

106.     Plaintiff has a history of Specific Learning Disability and was regarded as having

a disability by coworkers who called him derogatory names like "Double D" (Dumb

Dumb) and "retarded."

107.     Plaintiff was subjected to unwelcome harassment.

108.     Plaintiff's coworkers called him "retarded" and referred to his work area as the

"Retard Room."

109.     The harassment was based on Plaintiff's perceived disability.

110.     The derogatory terms used by Plaintiff's coworkers, such as "retarded" and

"Dumb Dumb," directly related to Plaintiff's perceived mental impairment.

111.     The harassment was sufficiently severe or pervasive to alter the terms and

conditions of Plaintiff's employment.

112.    The harassment was ongoing from early 2024 until Plaintiff's termination in November 2024.

113.    The persistent nature and offensive character of the harassment created a hostile work environment that altered Plaintiff's working conditions.

114.    There is a basis for employer liability.

115.    Plaintiff reported the harassment to his supervisor and to HR, but Defendant failed to take effective remedial action to stop the harassment.

116.    Despite HR's investigation and having employees sign a sexual harassment notice, Defendant did nothing to address the harassment relating to his disability or perceived disability. Thus, the harassment continued, demonstrating Defendant's failure to take appropriate action to address the hostile work environment.

## COUNT VI: ACRA- Disability Retaliation in Violation of Ark. Code Ann. § 16-123-108

117.    Plaintiff repeats and re-alleges all the preceding paragraphs as if fully set forth in this section.

118.    Plaintiff engaged in protected activity under the ACRA.

119.    Plaintiff reported harassment related to his perceived disability to his supervisor and to HR.

120.    The harassment Plaintiff reported included being called "retarded" and having his work area referred to as the "Retard Room."

121.    Plaintiff suffered an adverse employment action.

122.    Plaintiff was terminated from his employment on November 11, 2024.

15

123.    There was a causal connection between Plaintiff's protected activity and the adverse employment action.

124.    Plaintiff was terminated after repeatedly reporting harassment related to his perceived disability.

125.    The timing and circumstances of Plaintiff's termination suggest a causal connection to his complaints.

126.    Plaintiff was accused of acting strangely on a forklift on November 8, 2024, sent home, and then required to take a drug test on November 11, 2024, which Defendant claimed he failed.

127.    Plaintiff passed a drug test for a new job the very next day, suggesting Defendant's stated reason for termination was pretextual and may have been in retaliation for Plaintiff's complaints about disability-based harassment.

## COUNT VII: ACRA- Hostile Work Environment Based on Disability in Violation of Ark. Code Ann. § 16-123-107

128.    Plaintiff repeats and re-alleges all the preceding paragraphs as if fully set forth in this section.

129.    Plaintiff is a qualified individual who was regarded as having a disability within the meaning of the ACRA.

130.    Plaintiff has a history of Specific Learning Disability and was regarded as having a disability by coworkers who called him derogatory names like "Double D" (Dumb Dumb) and "retarded."

131.    Plaintiff was subjected to unwelcome harassment.

16

132.    Plaintiff's coworkers called him "retarded" and referred to his work area as the "Retard Room."

133.    The harassment was based on Plaintiff's perceived disability.

134.    The derogatory terms used by Plaintiff's coworkers, such as "retarded" and "Dumb Dumb," directly related to Plaintiff's perceived mental impairment.

135.    The harassment was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment.

136.    The harassment was ongoing from early 2024 until Plaintiff's termination in November 2024.

137.    The persistent nature and offensive character of the harassment created a hostile work environment that altered Plaintiff's working conditions.

138.    There is a basis for employer liability.

139.    Plaintiff reported the harassment to his supervisor and to HR, but Defendant failed to take effective remedial action to stop the harassment.

140.    Despite HR's investigation and having employees sign a sexual harassment notice, Defendant did nothing to address the harassment relating to his disability or perceived disability. Thus, the harassment continued, demonstrating Defendant's failure to take appropriate action to address the hostile work environment.

## COUNT VIII: ACRA- Discrimination based on disability in violation of § 16-123-107

141.    Plaintiff repeats and re-alleges all the preceding paragraphs as if fully set forth in this section.

142.    Plaintiff was regarded as having a disability within the meaning of the ACRA.

17

143.     Plaintiff has a history of Specific Learning Disability that required special school programs.

144.     Plaintiff's coworkers called him derogatory names like "Double D" (Dumb Dumb) and "retarded," demonstrating that they regarded him as having a mental impairment.

145.     Plaintiff's coworkers referred to his work area as the "DD room" and the "retard room," further demonstrating that Plaintiff was regarded as having a mental impairment.

146.     Plaintiff was qualified to perform the essential functions of his job.

147.     Plaintiff was hired as a welder and performed his job duties from January 23, 2023, until his termination on November 11, 2024.

148.     Plaintiff was later trained to operate a forklift, demonstrating that defendant considered him qualified to perform additional job duties.

149.     Plaintiff suffered an adverse employment action.

150.     Plaintiff was terminated from his employment on November 11, 2024.

151.     The circumstances give rise to an inference of discrimination based on Plaintiff's perceived disability.

152.     Defendant claimed that Plaintiff failed a drug test, but Plaintiff passed a drug test for another job the very next day, suggesting that defendant's stated reason for termination was pretextual.

153.     The timing of Plaintiff's termination, following months of disability-based harassment, supports an inference that Plaintiff's termination was based on his perceived disability.

## COUNT IX: ACRA- Sexual Harassment/Hostile Work Environment in Violation of Ark. Code Ann. § 16-123-107

18

154.     Plaintiff repeats and re-alleges all the preceding paragraphs as if fully set forth in this section.

155.     Plaintiff is a male and a member of a protected class under ACRA.

156.     Plaintiff was subjected to unwelcome sexual harassment.

157.     Plaintiff's coworkers approached him from behind, pretended to hug him, and then simulated sexual intercourse by "humping" him from behind.

158.     Plaintiff's coworkers called him "gay" and made sexually suggestive comments.

159.     The harassment Plaintiff experienced was based on sex.

160.     The sexual nature of the physical conduct and verbal comments directed at Plaintiff constituted harassment based on sex.

161.     The harassment affected a term, condition, or privilege of Plaintiff's employment.

162.     The harassment was sufficiently severe and pervasive to create a hostile work environment that altered the conditions of Plaintiff's employment.

163.     The harassment started in early 2024 and continued until November 2024.

164.     Defendant knew or should have known of the harassment and failed to take appropriate remedial action.

165.     Plaintiff reported the sexual harassment to his supervisor and HR in March 2024.

166.     Despite HR having employees sign a sexual harassment notice and attend a brief lecture regarding sexual harassment, the harassment continued, and Defendant failed to take effective measures to stop it.

167.     Plaintiff continued to report the harassment all the way through to his termination in November 2024.

168.     The harassment culminated in Plaintiff's termination in November 2024.

## COUNT X: ACRA- Sexual Harassment Retaliation in Violation of Ark. Code Ann.

## § 16-123-108

169.     Plaintiff repeats and re-alleges all the preceding paragraphs as if fully set forth in this section.

170.     Plaintiff engaged in protected activities.

171.     Plaintiff opposed the sexual harassment and informed management and HR of the unwanted harassment as early as March 2024, and on multiple occasions reported the continuing harassment to management through November 2024.

172.     The harassment Plaintiff reported included being called "gay," and other variations of the word "gay" intended as insults, and being "humped" by a coworker.

173.     Plaintiff suffered an adverse employment action.

174.     Plaintiff was terminated from his employment on November 11, 2024.

175.     There was a causal connection between Plaintiff's protected activity and the adverse employment action.

176.     Plaintiff was terminated after repeatedly reporting harassment related to his perceived disability.

177.     The timing and circumstances of Plaintiff's termination suggest a causal connection to his complaints.

178.     Plaintiff was accused of acting strangely on a forklift on November 8, 2024, sent home, and then required to take a drug test on November 11, 2024, which Defendant claimed he failed.

179.     Plaintiff passed a drug test for a new job the very next day, suggesting

Defendant's stated reason for termination was pretextual and may have been in retaliation

for Plaintiff's complaints about sexual harassment.

## PROCEDURAL REQUIREMENT

180.     On January 23, 2025, Plaintiff filed a Charge of Discrimination (No. 493-2025-

00946) with the Equal Employment Opportunity Commission ("EEOC"), alleging

multiple violations of the Americans with Disabilities Act and Title VII of the Civil

Rights Act of 1964.

181.     On September 2, 2025, upon Plaintiff's request, the EEOC issued its "Notice of

Right to Sue," which *inter alia* gave Plaintiff the right to sue Defendant within 90 days

from the date he received the above-mentioned notice. **See copy of Plaintiff's "Notice of**

**Right to Sue" is attached as Plaintiff's Exhibit "A".**

182.     Plaintiff has met the statutory requirement of filing this Complaint within ninety

(90) days of receiving the "Notice of Right to Sue"

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and

against Defendant, and award the following relief:

1.  Back pay and benefits from the date of Plaintiff's termination until judgment, plus

    interest;

2.  Front pay and benefits in lieu of reinstatement, if reinstatement is not feasible;

3.  Compensatory damages for emotional distress, mental anguish, humiliation, and loss of

    enjoyment of life caused by defendant's unlawful conduct;

4. Punitive damages in an amount to be determined at trial for defendant's malicious and reckless disregard of Plaintiff's federally protected rights;

5. Reasonable attorneys' fees and costs incurred in this action;

6. An order requiring Defendant to implement effective anti-discrimination and anti-harassment policies and training;

7. Such other relief as the Court deems just and proper.

## **JURY DEMAND**

1. Plaintiff requests a trial by jury on all issues so triable.

Respectfully submitted,

Grayson Hinojosa, AR Bar No. 2014251
McMath Woods P.A.
711 West Third Street
Little Rock, AR 72201
Phone: (501) 396-5403
Facsimile: (501) 374-5118
Email: grayson@mcmathlaw.com

*Attorney for Plaintiff*

Dated this 1st day of December, 2025

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Little Rock Area Office**
820 Louisiana St, Suite 200
Little Rock, AR 72201
(501) 900-6130
Website: www.eeoc.gov

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)
### (This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 09/02/2025

**To:** Daniel A. King
    1804 south Dayton avenue
    RUSSELLVILLE, AR 72802
Charge No: 493-2025-00946

EEOC Representative and email:    JEROME NUNLEY
                                      INVESTIGATOR
                                      JEROME.NUNLEY@EEOC.GOV

### NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge. The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court WITHIN 90 DAYS of your receipt of the EEOC's official notice of dismissal. Otherwise, your right to sue based on the above-numbered charge will be lost.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 493-2025-00946

On behalf of the Commission,

Digitally Signed By:William A Cash
09/02/2025
_____
William A Cash
Area Office Director


PLAINTIFF'S
EXHIBIT
A

**Cc:**
Shaun Robinson
102 Industrial Dr.
Batesville, AR 72501

Jason Carson
Bad Boy Inc.
102 Industrial Drive
Batesville, AR 72501

NA NA
102 Industrial Drive
Batesville, AR 72501

Punchwork Law Esq.
WH Law
1 Riverfront Rd, Ste 745
NORTH LITTLE ROCK, AR 72114


Please retain this Notice for your records.

Enclosure with EEOC Notice of Closure and Rights (05/25)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a

Enclosure with EEOC Notice of Closure and Rights (05/25)

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 493-2025-00946 to the District Director at Delner Franklin-Thomas, 200 Jefferson Ave Suite 1400, Memphis, TN 38103.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 493-2025-00946 to the District Director at Delner Franklin-Thomas, 200 Jefferson Ave Suite 1400, Memphis, TN 38103.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

### NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

- ✓ **Only one** major life activity need be substantially limited.

Enclosure with EEOC Notice of Closure and Rights (05/25)

- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.

- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability."

***Note:** Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.